Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued December 2, 2002       Decided March 11, 2003

No. 02-5251

KHALED A. F. AL ODAH, ET AL.,
APPELLANTS

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

————

Consolidated with
Nos. 02-5284, 02-5288

————

Appeals from the United States District Court
for the District of Columbia
(02cv00299)
(02cv00828)
(02cv01130)

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Thomas B. Wilner* and *Joseph Margulies* argued the cause for appellants. With them on the briefs were *Neil H. Koslowe*, *Michael Ratner*, *Beth Stephens*, and *L. Barrett Boss*.

*William J. Aceves* was on the briefs of *amici curiae* The International Centre for the Legal Protection of Human Rights and International Human Rights Organizations and Law Scholars in support of appellants.

*David P. Sheldon* was on the brief of *amicus curiae* National Association of Criminal Defense Lawyers in support of appellants.

*Paul D. Clement*, Deputy Solicitor General, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, *Gregory G. Katsas*, Deputy Assistant Attorney General, U.S. Department of Justice, *Gregory G. Garre* and *David B. Salmons*, Assistants to the Solicitor General, *Douglas N. Letter, Robert M. Loeb* and *Katherine S. Dawson*, Attorneys.

*Daniel J. Popeo, Richard A. Samp* and *Paul D. Kamenar* were on the brief for *amici curiae* Washington Legal Foundation, *et al.*, in support of appellees.

Before: RANDOLPH and GARLAND, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Concurring opinion filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: Through their "next friends," aliens captured abroad during hostilities in Afghanistan and held abroad in United States military custody at the Guantanamo Bay Naval Base in Cuba brought three actions contesting the legality and conditions of their confinement. The ultimate question presented in each case is whether the district court had jurisdiction to adjudicate their actions.

## I.

The Constitution, as its preamble also declares, empowers Congress to "provide for the common Defence." U.S. CONST.

art. I, § 8. To that end, the Constitution gives Congress the power "To raise and support Armies," "To provide and maintain a Navy," "To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water." *Id.* To that end as well, the Constitution invests the President with the "executive Power," and makes him "Commander in Chief" of the country's military. Art. II, §§ 1 & 2; *see Ex parte Quirin*, 317 U.S. 1, 25-26 (1942).

In response to the attacks of September 11, 2001, and in the exercise of its constitutional powers, Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided" the attacks and recognized the President's "authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224, 224 (2001). The President declared a national emergency, Proclamation No. 7453, Declaration of a National Emergency by Reason of Certain Terrorist Attacks, 66 Fed. Reg. 48,199 (Sept. 14, 2001), and, as Commander in Chief, dispatched armed forces to Afghanistan to seek out and subdue the al Qaeda terrorist network and the Taliban regime that had supported and protected it. During the course of the Afghanistan campaign, the United States and its allies captured the aliens whose next friends bring these actions.

In one of the cases (*Al Odah v. United States*, No. 02-5251), fathers and brothers of twelve Kuwaiti nationals detained at Camp X-Ray in Guantanamo Bay brought an action in the form of a complaint against the United States, President George W. Bush, Secretary of Defense Donald H. Rumsfeld, Chairman of the Joint Chiefs of Staff Gen. Richard B. Myers, Brig. Gen. Rick Baccus, whom they allege is the Commander of Joint Task Force 160, and Col. Terry Carrico, the Commandant of Camp X-Ray/Camp Delta. None of the plaintiffs' attorneys have communicated with the Kuwaiti detainees. The complaint alleges that the detainees were in Afghanistan and Pakistan as volunteers providing humanitarian aid; that local villagers seeking bounties seized them and handed them

over to United States forces; and that they were transferred to Guantanamo Bay sometime between January and March 2002. A representative of the United States Embassy in Kuwait informed the Kuwaiti government of their whereabouts. Invoking the Great Writ, 28 U.S.C. §§ 2241-2242; the Alien Tort Act, 28 U.S.C. § 1350; and the Administrative Procedure Act, the *Al Odah* plaintiffs claim a denial of due process under the Fifth Amendment, tortious conduct in violation of the law of nations and a treaty of the United States, and arbitrary and unlawful governmental conduct. They seek a declaratory judgment and an injunction ordering that they be informed of any charges against them and requiring that they be permitted to consult with counsel and meet with their families.

*Rasul v. Bush* (No. 02-5288) is styled a petition for a writ of habeas corpus on behalf of three detainees, although it seeks other relief as well. The next friends bringing the petition are the father of an Australian detainee, the father of a British detainee, and the mother of another British detainee. Respondents are President Bush, Secretary Rumsfeld, Col. Carrico, and Brig. Gen. Michael Lehnert, who is alleged to be the Commander of Joint Task Force 160. The petition claims that the Australian detainee was living in Afghanistan when the Northern Alliance captured him in early December 2001; that one of the British detainees traveled to Pakistan for an arranged marriage after September 11, 2001; and that the other British detainee went to Pakistan after that date to visit relatives and continue his computer education. The next friends learned of their sons' detention at Guantanamo Bay from their respective governments. The *Rasul* petitioners claim violations of due process under the Fifth and Fourteenth Amendments, international law, and military regulations; a violation of the War Powers Clause; and a violation of Article I of the Constitution because of the President's alleged suspension of the writ of habeas corpus. They seek a writ of habeas corpus, release from unlawful custody, access to counsel, an end to interrogations, and other relief.

*Habib v. Bush* (No. 02-5284) is also in the form of a petition for writ of habeas corpus and is brought by the wife of an

Australian citizen, acting as his next friend. Naming President Bush, Secretary Rumsfeld, Brig. Gen. Baccus, and Lt. Col. William Cline as defendants, the petition alleges that Habib traveled to Pakistan to look for employment and a school for his children; that after Pakistani authorities arrested him in October 2001, they transferred him to Egyptian authorities, who handed him over to the United States military; and that the military moved him from Egypt to Afghanistan and ultimately to Guantanamo Bay in May 2002. Australian authorities visited Guantanamo and issued a press release confirming Habib's presence there. The *Habib* petition, like the other two cases, invokes the Due Process Clause of the Fifth Amendment and other constitutional provisions, the Alien Tort Act, the Administrative Procedure Act, due process under international law, and United States military regulations. Habib seeks a writ of habeas corpus, legally sufficient process to establish the legality of his detention, access to counsel, an end to all interrogations of him, and other relief.

The district court held that it lacked jurisdiction. Believing no court would have jurisdiction, it dismissed the complaint and the two habeas corpus petitions with prejudice. *Rasul v. Bush*, 215 F. Supp. 2d 55, 56 (D.D.C. 2002). In the court's view all of the detainees' claims went to the lawfulness of their custody and thus were cognizable only in habeas corpus. *Id.* at 62-64. Relying upon *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the court ruled that it did not have jurisdiction to issue writs of habeas corpus for aliens detained outside the sovereign territory of the United States. *Rasul*, 215 F. Supp. 2d at 72-73.

## II.

While these cases were pending, the Ninth Circuit affirmed an order dismissing a habeas corpus petition for all Guantanamo detainees on the ground that those bringing the action – clergy, lawyers, and law professors – were not proper "next friends." *Coalition of Clergy, Lawyers & Law Professors v. Bush*, 310 F.3d 1153, 1165 (9th Cir. 2002). In the cases

before us, the government does not question the "next friend" status of the individuals prosecuting the actions, at least insofar as they seek writs of habeas corpus. There is a long history, going back to the 1600s in England, of "next friends" invoking the Great Writ on behalf of prisoners who are unable to do so because of their inaccessibility. *Whitmore v. Arkansas*, 495 U.S. 149, 162 (1990). For the federal courts, Congress codified the practice in 1948: a habeas corpus petition now may be brought "by the person for whose relief it is intended or by someone acting in his behalf." 28 U.S.C. § 2242. The next friends in these cases have demonstrated through affidavits that they are "truly dedicated to the best interests of these individuals," that they have a "significant relationship" with the detainees, and that the named detainees are inaccessible. *Whitmore*, 495 U.S. at 163-64. We shall therefore treat the cases as if the detainees themselves were prosecuting the actions. *Id.* at 163.

In each of the three cases, the detainees deny that they are enemy combatants or *enemy* aliens. Typical of the denials is this paragraph from the petition in *Rasul*:

> The detained petitioners are not, and have never been, members of Al Qaida or any other terrorist group. Prior to their detention, they did not commit any violent act against any American person, nor espouse any violent act against any American person or property. On information and belief, they had no involvement, direct or indirect, in either the terrorist attacks on the United States September 11, 2001, or any act of international terrorism attributed by the United States to al Qaida or any terrorist group.

(As the district court pointed out, an affidavit from the father of the Australian detainee in *Rasul* admitted that his son had joined the Taliban forces. *Rasul*, 215 F. Supp. 2d at 60 n.6.) Although the government asked the district court to take judicial notice that the detainees are "enemy combatants," the court declined and assumed the truth of their denials. *Id.* at 67 n.12.

This brings us to the first issue: whether the Supreme Court's decision in *Johnson v. Eisentrager*, which the district court found dispositive, is distinguishable on the ground that the prisoners there were "enemy aliens." In the two and a half years leading up to the 1950 *Eisentrager* decision, "German enemy aliens confined by American military authorities abroad" filed more than 200 habeas corpus petitions invoking the Supreme Court's original jurisdiction. 339 U.S. at 768 n.1. The Court denied each petition, often with four Justices announcing that they would dismiss for lack of jurisdiction. *Id.*; *see* Charles Fairman, *Some New Problems of the Constitution Following the Flag*, 1 STAN. L. REV. 587, 593-600 (1949). Justice Jackson, the author of the *Eisentrager* opinion, recused himself from each of the cases, doubtless because of his service (after his appointment to the Court) as Representative and Chief Counsel at the Nazi war crime trials in Nuremberg from 1945 to 1946. *See* Telford Taylor, *The Nuremberg Trials*, 55 COLUM. L. REV. 488 (1955).

*Eisentrager* differed from the earlier World War II habeas petitions. The case started not in the Supreme Court, but in a district court; and the Germans seeking the writ had not been convicted at Nuremberg. After Germany's surrender on May 8, 1945, but before the surrender of Japan, twenty-one German nationals in China assisted Japanese forces fighting against the United States. The Germans were captured, tried by an American military commission headquartered in Nanking, convicted of violating the laws of war, and transferred to the Landsberg prison in Germany, which was under the control of the United States Army. 339 U.S. at 765–66. One of the prisoners, on behalf of himself and the twenty others, sought writs of habeas corpus in the United States District Court for the District of Columbia, claiming violations of the Constitution, other laws of the United States, and the 1929 Geneva Convention. *Id.* at 767. The district court dismissed for lack of jurisdiction, but the court of appeals reversed. *Eisentrager v. Forrestal*, 174 F.2d 961 (D.C. Cir. 1949).

The Supreme Court, agreeing with the district court, held that "the privilege of litigation" had not been extended to the

German prisoners. 339 U.S. at 777-78. (Although *Eisentrager* discussed only the jurisdiction of federal courts, state courts do not have jurisdiction to issue writs of habeas corpus for the discharge of a person held under the authority of the United States. *Tarble's Case*, 80 U.S. (13 Wall.) 397 (1872).) The prisoners therefore had no right to petition for a writ of habeas corpus: "these prisoners at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." 339 U.S. at 778. Moreover, "trials would hamper the war effort and bring aid and comfort to the enemy." *Id.* at 779. Witnesses, including military officials, might have to travel to the United States from overseas. Judicial proceedings would engender a "conflict between judicial and military opinion" and "would diminish the prestige of" any field commander as he was called "to account in his own civil courts" and would "divert his efforts and attention from the military offensive abroad to the legal defensive at home." *Id.*

The detainees here are quite right that throughout its opinion, the Supreme Court referred to the *Eisentrager* prisoners as "enemy aliens." The petitioners in *Habib* and *Rasul* distinguish themselves from the German prisoners on the ground that they have not been charged and that the charges in *Eisentrager* are what rendered the prisoners "enemies." For this they rely on Justice Brennan's dissenting opinion in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 290-91 (1990). Brief for Appellants at 29 (No. 02-5284 et al.). *Eisentrager*, Justice Brennan wrote, "rejected the German nationals' efforts to obtain writs of habeas corpus not because they were foreign nationals, but because they were enemy soldiers." 494 U.S. at 291 (Brennan, J., dissenting). This seems to us doubly mistaken. In the first place, the German prisoners were not alleged to be "soldiers." They were civilian employees of the German government convicted of furnishing intelligence to the Japanese about the movement of American forces in China. *Eisentrager*, 339 U.S. at 765-66; *Eisentrager*, 174 F.2d at 962. In the second place, it

was not their convictions – which they contested – that rendered them "enemy aliens." The Supreme Court made this explicit: "It is not for us to say whether these prisoners were or were not guilty of a war crime," 339 U.S. at 786; "the petition of these prisoners admits[ ] that they are really alien enemies," *id.* at 784. The Court's description of the prisoners as "enemy aliens" rested instead on their status as nationals of a country at war with the United States. *Id.* at 769 n.2 (quoting *Techt v. Hughes*, 229 N.Y. 222, 229 (1920) (Cardozo, J.)). (Although Germany surrendered in 1945, the state of war with Germany did not end until October 19, 1951. Pub. L. No. 82-181, 65 Stat. 451; *see United States ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952) (per curiam).) This is the time-honored meaning of the term. "Every individual of the one nation must acknowledge every individual of the other nation as his own enemy – because the enemy of his country." *The Rapid*, 12 U.S. (8 Cranch) 155, 161 (1814); *see Guessefeldt v. McGrath*, 342 U.S. 308 (1952); *Lamar v. Browne*, 92 U.S. 187, 194 (1875); J. Gregory Sidak, *War, Liberty, and Enemy Aliens*, 67 N.Y.U. L. REV. 1402, 1406 (1992); *see also* The Alien Enemy Act of 1798, 50 U.S.C. §§ 21-24. Despite the government's argument to the contrary, it follows that none of the Guantanamo detainees are within the category of "enemy aliens," at least as *Eisentrager* used the term. They are nationals of Kuwait, Australia, or the United Kingdom. Our war in response to the attacks of September 11, 2001, obviously is not against these countries. It is against a network of terrorists operating in secret throughout the world and often hiding among civilian populations. An "alien friend" may become an "alien enemy" by taking up arms against the United States, but the cases before us were decided on the pleadings, each of which denied that the detainees had engaged in hostilities against America.

Nonetheless the Guantanamo detainees have much in common with the German prisoners in *Eisentrager*. They too are aliens, they too were captured during military operations, they were in a foreign country when captured, they are now abroad, they are in the custody of the American military, and they have never had any presence in the United States. For

the reasons that follow we believe that under *Eisentrager* these factors preclude the detainees from seeking habeas relief in the courts of the United States.

The court of appeals in *Eisentrager* had ruled that "any person who is deprived of his liberty by officials of the United States, acting under the purported authority of that Government," and who can establish a violation of the Constitution, "has a right to the writ." 174 F.2d at 963. This statement of law, unconstrained by the petitioner's citizenship or residence, by where he is confined, by whom or for what, "necessarily" followed – thought the court of appeals – from the Fifth Amendment's application to "any person" and from the court's view that no distinction could be made between "citizens and aliens." *Id.* at 963-65. As the Supreme Court described it, the court of appeals thus treated the right to a writ of habeas corpus as a "subsidiary procedural right that follows from the possession of substantive constitutional rights." 339 U.S. at 781.

In answer the Supreme Court rejected the proposition "that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses," *id.* at 783. The Court continued: "If the Fifth Amendment confers its rights on all the world . . . [it] would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in our First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments." *Id.* at 784. (Shortly before Germany's surrender, the Nazis began training covert forces called "werewolves" to conduct terrorist activities during the Allied occupation. *See, e.g.*, http://www.archives.gov/iwg/declassified_records/oss_records_263_wilhelm_hoettl.html.) The passage of the opinion just quoted may be read to mean that the constitutional rights mentioned are not held by aliens outside the sovereign territory of the United States, regardless of whether they are

enemy aliens. That is how later Supreme Court cases have viewed *Eisentrager*.

In 1990, for instance, the Court stated that *Eisentrager* "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *Verdugo-Urquidez*, 494 U.S. at 269. After describing the facts of *Eisentrager* and quoting from the opinion, the Court concluded that with respect to aliens "our rejection of the extraterritorial application of the Fifth Amendment was emphatic." *Id.* By analogy, the Court held that the Fourth Amendment did not protect nonresident aliens against unreasonable searches or seizures conducted outside the sovereign territory of the United States. Citing *Eisentrager* again, the Court explained that to extend the Fourth Amendment to aliens abroad "would have serious and deleterious consequences for the United States in conducting activities beyond its borders," particularly since the government "frequently employs Armed Forces outside this country," *id.* at 273. A decade after *Verdugo-Urquidez*, the Court – again citing *Eisentrager* – found it "well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

Although the Supreme Court's statement in *Verdugo-Urquidez* about the Fifth Amendment was dictum, our court has followed it. In *Harbury v. Deutch*, 233 F.3d 596, 604 (D.C. Cir. 2000), *rev'd on other grounds sub nom. Christopher v. Harbury*, 536 U.S. 403 (2002), we quoted extensively from *Verdugo-Urquidez* and held that the Court's description of *Eisentrager* was "firm and considered dicta that binds this court." Other decisions of this court are firmer still. Citing *Eisentrager*, we held in *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960), that "non-resident aliens . . . plainly cannot appeal to the protection of the Constitution or laws of the United States." The law of the circuit now is that a "foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." *People's Mojahedin Org. v. Dep't of State*, 182

F.3d 17, 22 (D.C. Cir. 1999); *see also 32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002).

The consequence is that no court in this country has jurisdiction to grant habeas relief, under 28 U.S.C. § 2241, to the Guantanamo detainees, even if they have not been adjudicated enemies of the United States. We cannot see why, or how, the writ may be made available to aliens abroad when basic constitutional protections are not. This much is at the heart of *Eisentrager*. If the Constitution does not entitle the detainees to due process, and it does not, they cannot invoke the jurisdiction of our courts to test the constitutionality or the legality of restraints on their liberty. *Eisentrager* itself directly tied jurisdiction to the extension of constitutional provisions: "in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act." 339 U.S. at 771. Thus, the "privilege of litigation has been extended to aliens, *whether friendly or enemy*, only because permitting their presence in the country implied protection." *Id.* at 777-78 (emphasis added). In arguing that *Eisentrager* turned on the status of the prisoners as enemies, the detainees do not deny that if they are in fact in that category, if they engaged in international terrorism or were affiliated with al Qaeda, the courts would not be open to them. Their position is that the district court should have made these factual determinations at the threshold, before dismissing for lack of jurisdiction. But the Court in *Eisentrager* did not decide to avoid all the problems exercising jurisdiction would have caused, only to confront the same problems in determining whether jurisdiction exists in the first place.

It is true that after deciding jurisdiction did not exist, the Supreme Court, in part IV of its *Eisentrager* opinion, went on to consider and reject the merits of the prisoners' claims. From this the detainees reason that the Court's holding must have been merely that the military courts, rather than the civilian courts, had jurisdiction to try charges of war crimes, not that the district court lacked jurisdiction to adjudicate the habeas petition. We find it impossible to read the Court's

statements – many of which we have already quoted – about the courts not being open to the prisoners as so limited. The discussion in part IV of the Court's opinion was extraneous. The dissenting Justices viewed it as such, calling part IV "gratuitous," "wholly irrelevant," lending "no support whatever to the Court's holding that the District Court was without jurisdiction." 339 U.S. at 792, 794 (Black, J., joined by Douglas and Burton, JJ., dissenting). There is a ready explanation for the *Eisentrager* Court's method. Before *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Supreme Court (and the lower federal courts) were not always punctilious in treating jurisdiction as an antecedent question to the merits. The Court in *Steel Co.* acknowledged as much. *See* 523 U.S. at 101. Part IV of *Eisentrager*, whether an advisory opinion (*see* 523 U.S. at 101) or an alternative holding, does not detract from the central meaning of the decision that the district court did not have jurisdiction to issue writs of habeas corpus.

We have thus far assumed that the detainees are not "within any territory over which the United States is sovereign," *Eisentrager*, 339 U.S. at 778. The detainees dispute the assumption. They say the military controls Guantanamo Bay, that it is in essence a territory of the United States, that the government exercises sovereignty over it, and that in any event *Eisentrager* does not turn on technical definitions of sovereignty or territory.

The United States has occupied the Guantanamo Bay Naval Base under a lease with Cuba since 1903, as modified in 1934. Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418 (6 Bevans 1113) ("1903 Lease"); Relations With Cuba, May 9, 1934, U.S.-Cuba, T.S. No. 866 (6 Bevans 1161) ("1934 Lease"). In the 1903 Lease, "the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba" over the naval base. 1903 Lease, art. III. The term of the lease is indefinite. 1903 Lease, art. I; 1934 Lease, art. III ("So long as the United States of America shall not abandon the said naval station at Guantanamo or the two Governments shall not

agree to a modification of its present limits, the station shall continue to have the territorial area that it now has . . . .").

The detainees think criminal cases involving aliens and United States citizens for activities at Guantanamo Bay support their position. But those cases arose under the special maritime and territorial jurisdiction, *see* 18 U.S.C. § 7. In *United States v. Lee*, 906 F.2d 117 (4th Cir. 1990) (per curiam), a Jamaican national was charged with committing a crime at Guantanamo. The indictment invoked the special maritime and territorial jurisdiction of the United States pursuant to 18 U.S.C. § 7 and 18 U.S.C. § 3238. *Id.* at 117 n.1. Extension of federal criminal law pursuant to these provisions does not give the United States sovereignty over Guantanamo Bay any more than it gives the United States sovereignty over foreign vessels destined for this country because crimes committed onboard are also covered. *See* 18 U.S.C. § 7(8).

The text of the leases, quoted above, shows that Cuba – not the United States – has sovereignty over Guantanamo Bay. This is the conclusion of *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412 (11th Cir. 1995). The Eleventh Circuit there rejected the argument – which the detainees make in this case – that with respect to Guantanamo Bay " 'control and jurisdiction' is equivalent to sovereignty." *Id.* at 1425. The Supreme Court reached the same conclusion in *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 381 (1948). In holding that a naval base in Bermuda, controlled by the United States under a lease with Great Britain, was outside United States sovereignty, the Court took notice of the lease with Cuba for the Guantanamo Bay Naval Base and the fact that it granted the United States "substantially the same rights as it has in the Bermuda lease." *Id.* at 383. The "determination of sovereignty over an area," the Court held, "is for the legislative and executive departments." *Id.* at 380. The contrary decision of the Second Circuit, on which the detainees rely – *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326 (2d Cir. 1992), *vacated as moot, Sale v. Haitian Centers Council, Inc.*, 509 U.S. 918 (1993) – has no precedential value because the Supreme Court vacated it. The

decision was, in any event, at odds with the Supreme Court's reasoning not only in *Vermilya-Brown*, but also in *Spelar v. United States*, 338 U.S. 217 (1949). The Second Circuit's result rested in very large measure on its extraterritorial application of the Fifth Amendment to non-resident aliens, *see* 969 F.2d at 1342-43, a position we rejected in *People's Mojahedin Org. v. Dep't of State*, 182 F.3d at 22, and in *Harbury v. Deutch*, 233 F.3d at 604, and a position we reject again today. And the Second Circuit thought it important that the United States controlled Guantanamo Bay. 969 F.2d at 1342-44. But under *Eisentrager*, control is surely not the test. Our military forces may have control over the naval base at Guantanamo, but our military forces also had control over the Landsberg prison in Germany.

We also disagree with the detainees that the *Eisentrager* opinion interchanged "territorial jurisdiction" with "sovereignty," without attaching any particular significance to either term. When the Court referred to "territorial jurisdiction," it meant the territorial jurisdiction of the United States courts, as for example in these passages quoted earlier: "in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act" (339 U.S. at 771); and "the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of United States courts" (*id.* at 778). Sovereignty, on the other hand, meant then – and means now – supreme dominion exercised by a nation. The United States has sovereignty over the geographic area of the States and, as the *Eisentrager* Court recognized, over insular possessions, *id.* at 780. Guantanamo Bay fits within neither category.

As against this the detainees point to *Ralpho v. Bell*, 569 F.2d 607 (D.C. Cir. 1977). After World War II, the United Nations designated the United States as administrator of the Trust Territory of Micronesia. *Id.* at 612. No country had sovereignty over the region, but the court treated Micronesia as if it were a territory of the United States, over which Congress could and did exercise its power under Article IV of

the Constitution. (The United States did not hold the Trust Territory "in fee simple ... but rather as trustee," a difference the court considered irrelevant. *Id.* at 619.) The court therefore described the residents of Micronesia as being "as much American subjects as those in other American territories." *Id.* In the Micronesian Claims Act, Congress established a commission to distribute a fund for claims against the United States for damages suffered during World War II. Because Congress intended the Micronesia Trust Territory to be treated as if it were a territory of the United States, the court held that the right of due process applied to the commission's actions. *Id.* at 629-30. Given the premises on which the court acted, its holding is hardly surprising. "Fundamental personal rights" found in the Constitution apply in territories. *See, e.g.*, *Balzac v. Porto Rico*, 258 U.S. 298, 312-13 (1922); *see also Dorr v. United States*, 195 U.S. 138, 148 (1904) (considering the law applicable in the Philippines); 48 U.S.C. § 1421b (Guam). *Ralpho* thus establishes nothing about the sort of *de facto* sovereignty the detainees say exists at Guantanamo. And its reasoning does not justify this court, or any other, to assert habeas corpus jurisdiction at the behest of an alien held at a military base leased from another nation, a military base outside the sovereignty of the United States.

### III.

In addition to seeking relief explicitly in the nature of a habeas corpus, the detainees sued for injunctions and declaratory judgments under the Alien Tort Act, 28 U.S.C. § 1350, alleging that the United States is confining them in violation of treaties and international law. The holding in *Eisentrager* – that "the privilege of litigation" does not extend to aliens in military custody who have no presence in "any territory over which the United States is sovereign" (339 U.S. at 777-78) – dooms these additional causes of action, even if they deal only with conditions of confinement and do not sound in habeas. *See Wolff v. McDonnell*, 418 U.S. 539, 554-55 (1974); *Brown v. Plaut*, 131 F.3d 163, 167 (D.C. Cir. 1997).

At the time of *Eisentrager*, the writ of habeas corpus extended to prisoners "in custody in violation of the Constitution or of a law or treaty of the United States," 28 U.S.C. § 453 (1946). The current habeas statute, 28 U.S.C. § 2241(c)(3), is very much the same. The prisoners in *Eisentrager* alleged violations of the Constitution, federal laws, and a treaty. So here. Each of the detainees alleges violations of the Constitution, treaties, and laws of the United States. The Alien Tort Act is a "law of the United States" and, the detainees believe, so is some international law. As to the latter, the theories are that federal common law incorporates "customary international law" and that the Alien Tort Act not only provides jurisdiction but also creates a cause of action – theories the Second Circuit promulgated in *Filartiga v. Pena-Irala*, 630 F.2d 876, 885-87 (2d Cir. 1980). But as we have decided, the detainees are in all relevant respects in the same position as the prisoners in *Eisentrager*. They cannot seek release based on violations of the Constitution or treaties or federal law; the courts are not open to them. Whatever other relief the detainees seek, their claims necessarily rest on alleged violations of the same category of laws listed in the habeas corpus statute, and are therefore beyond the jurisdiction of the federal courts. Nothing in *Eisentrager* turned on the particular jurisdictional language of any statute; everything turned on the circumstances of those seeking relief, on the authority under which they were held, and on the consequences of opening the courts to them. With respect to the detainees, those circumstances, that authority, and those consequences differ in no material respect from *Eisentrager*.

## IV.

We have considered and rejected the other arguments the detainees have made to the court. The judgment of the district court dismissing the complaint in No. 02-5251 and the

petitions for writs of habeas corpus in Nos. 02-5284 and 02-5288 for lack of jurisdiction is

*Affirmed.*\*

---

\* Although Judges Garland and Williams have not joined Judge Randolph's concurring opinion, they do not intend thereby to express any view about its reasoning. They believe the issues addressed need not be reached.

RANDOLPH, *Circuit Judge, concurring*: I write separately to add two other grounds for rejecting the detainees' non-habeas claims. But first some words are in order regarding the Alien Tort Act, 28 U.S.C. § 1350:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

Three courts of appeals have decided that § 1350 not only provides a federal forum but also creates a cause of action for violations of the "law of nations." The Second Circuit, in the decision launching this development, held first, that § 1350 conferred jurisdiction over an action by citizens of Paraguay against another citizen of that country for torts allegedly committed in Paraguay; and second, that "customary international law" is part of federal common law. *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). The same court of appeals later reiterated that § 1350 provided jurisdiction and gave aliens – in this instance, Muslim and Croat citizens of Bosnia-Herzegovina – a cause of action against the leader of the Bosnia Serbs for violations of "the law of nations" and treaties. *Kadic v. Karadzic*, 70 F.3d 232, 241–44 (2d Cir. 1995); *see Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 92–93 (2d Cir. 2000). The Ninth Circuit followed suit, holding that § 1350 gave a district court jurisdiction over the estate of the former Philippine President Marcos although all plaintiffs and defendants were Philippine nationals and although the torts, alleged to violate international law, occurred entirely in the Philippines. *Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litigation)*, 978 F.2d 493, 499 (9th Cir. 1992); *see also Hilao v. Estate of Marcos (In re Estate of Ferdinand E. Marcos, Human Rights Litigation)*, 25 F.3d 1467, 1473 (9th Cir. 1994); *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1383-84 (9th Cir. 1998). The Eleventh Circuit joined these courts of appeals in holding that § 1350 not only confers jurisdiction, but also gives federal courts the power to "fashion domestic common law remedies to give effect to violations of customary international law." *Abebe-Jira v. Negewo*, 72 F.3d 844, 847 (11th Cir. 1996).

The meaning of § 1350 has been an open question in our court. *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 777 (D.C. Cir. 1984) (Edwards, J., concurring); *id.* at 800 (Bork, J., concurring); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 20-07 (D.C. Cir. 1985). But what § 1350 does not mean has been decided. In the *Tel-Oren* case both Judge Bork and Judge Robb, in their separate concurring opinions, rejected the Second Circuit's *Filartiga* decision, Judge Bork on the ground that § 1350 does not create a cause of action, Judge Robb on the ground that *Filartiga* is "fundamentally at odds with the reality of the international structure and with the role of United States courts within that structure." *See* 726 F.2d at 801 (Bork, J.); *id.* at 826 n.5 (Robb, J.). Since then some of the opinions following *Filartiga* maintain that Congress ratified its interpretation of § 1350. *See, e.g.*, *Kadic*, 70 F.3d at 241; *Hilao*, 25 F.3d at 1475; *Abebe-Jira*, 72 F.3d at 848; *see also* William S. Dodge, *The Historical Origins of the Alien Tort Statute: A Response to the "Originalists,"* 19 HASTINGS INT'L & COMP. L. REV. 221, 224, 256 (1996). The ratification argument rests on enactment of the Torture Victim Protection Act of 1991, which provides a cause of action for damages to anyone – aliens and citizens alike – who suffered torture anywhere in the world at the hands of any individual acting under the law of any foreign nation. 28 U.S.C. § 1350 note. The Torture Victim Act does not contain its own jurisdictional provision. But it is clear that any case brought pursuant to that statute would arise under federal law and thus come within 28 U.S.C. § 1331, the grant of general federal question jurisdiction. (I mean to imply nothing about the constitutionality of the statute.) The Alien Tort Act is thus beside the point: it confers jurisdiction only over suits by aliens and only for violations of treaties and the law of nations. The House Report on the torture victim bill did state that § 1350 "should remain intact to permit suits based on other norms that already exist or may ripen in the future into the rules of customary international law." Torture Victim Protection Act of 1991, H.R. REP. NO. 102-367, pt. 1, at 4 (1991). But the statement of one congressional committee is by no means a statement of "Congress," as some have

supposed; the wish expressed in the committee's statement is reflected in no language Congress enacted; it does not purport to rest on an interpretation of § 1350; and the statement itself is legislative dictum.

The detainees, or at least some of them, nevertheless have urged us to follow the *Filartiga* line of cases. I see a number of problems in doing so, in addition to those mentioned by Judges Bork and Robb in *Tel-Oren*. To hold that the Alien Tort Act creates a cause of action for treaty violations, as the *Filartiga* decisions indicate, would be to grant aliens greater rights in the nation's courts than American citizens enjoy. Treaties do not generally create rights privately enforceable in the courts. Without authorizing legislation, individuals may sue for treaty violations only if the treaty is self-executing. *See, e.g.*, *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.); *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1107 (D.C. Cir. 2001); *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 n.1 (D.C. Cir. 1994); *Holmes v. Laird*, 459 F.2d 1211, 1220 (D.C. Cir. 1972); *Tel-Oren*, 726 F.2d at 808-10 (Bork, J., concurring). To illustrate, the detainees in this case claim that the military is confining them in violation of the Geneva Convention of 1949. But the second Geneva Convention, like the first, *see Eisentrager*, 339 U.S. at 789 n.14, is not self-executing for the reasons stated by Judge Bork in *Tel-Oren*, 726 F.2d at 808-09, and by the Fourth Circuit in *Hamdi v. Rumsfeld*, 316 F.3d 450, 468-69 (4th Cir. 2003). No American citizen, therefore, has a cause of action under this treaty. Yet on the basis of *Filartiga*, and the theory that the Alien Tort Act itself creates a cause of action, aliens could bring suit for its violation. *Martinez*, 141 F.3d at 1383-84, illustrates the point. The Ninth Circuit, relying on § 1350, sustained such a suit, brought by an alien against the City of Los Angeles for actions occurring in Mexico in violation of the "customary international law." The court of appeals derived this "customary international law" partly from the International Covenant on Civil and Political Rights. But the court neglected to mention that this multilateral agreement creates no judicially enforceable rights and that the Senate ratified

the treaty on the basis that it "will not create a private cause of action in U.S. courts." S. Exec. Rep. No. 102–23, at 9, 19, 23 (1992). I find it hard to believe the First Congress, which enacted the Alien Tort Act in 1789, intended to extend to aliens rights of actions withheld from the citizens of this country.

*Filartiga*'s theory that federal common law incorporates customary international law also raises many issues. The theory was necessary to sustain the constitutionality of § 1350 as the Second Circuit interpreted and applied it. Early in our history the Supreme Court held unconstitutional, in violation of Article III, the conferring of federal jurisdiction over suits by an alien against an alien. *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 304 (1809). In holding that federal common law somehow incorporates customary international law, the *Filartiga* court placed the case before it on the "arising under" head of jurisdiction without mentioning *Hodgson*. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972). This avoided the difficulty the Supreme Court's decision posed, but it created quite a few difficulties of its own.

For one thing, Article I, section 8, clause 10 of the Constitution gives Congress the power to "define and punish . . . Offenses against the Law of Nations." The Framers' original draft merely stated that Congress had the power to punish offenses against the law of nations, but when Gouverneur Morris of Pennsylvania objected that the law of nations was "often too vague and deficient to be a rule," the clause was amended to its present form. III Elliot's Debates in the Federal Convention of 1787 as Reported by James Madison 604 (James McClellan & M.E. Bradford eds., rev. ed. 1989). I believe this clause in Article I, section 8, particularly in light of the history just recounted, makes it abundantly clear that Congress – not the Judiciary – is to determine, through legislation, what international law is and what violations of it ought to be cognizable in the courts. Yet under *Filartiga*, it is the courts, not Congress who decide both questions. It is no answer to say that early Supreme Court cases looked to the "law of nations." The "law of nations" may have been part of the general federal common law in the days before *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), but even then "the

law of nations" did not present "any Federal question." *N.Y. Life Ins. Co. v. Hendren,* 92 U.S. 286, 286-87 (1875); *see Oliver Am. Trading Co. v. Mexico,* 264 U.S. 440, 442-43 (1924). And for good reason. The political branches of our government may influence but they by no means control the development of customary international law. To have federal courts discover it among the writings of those considered experts in international law and in treaties the Senate may or may not have ratified is anti-democratic and at odds with principles of separation of powers. As Judge Robb put it, the courts "ought not serve as debating clubs for professors willing to argue over what is or what is not an accepted violation of the law of nations." *Tel-Oren,* 726 F.2d at 827 (Robb, J., concurring). Nothing in the Constitution expressly authorizes such free-wheeling judicial power. After *Erie* brought an end to "general federal common law," federal common law has been mostly interstitial or generated by the need for uniformity throughout the States. *See generally* HENRY J. FRIENDLY, BENCHMARKS 155-95 (1967). A federal common law of customary international law is justified by neither consideration. Congress, when it ratifies treaties, often does so with reservations in order to avoid altering domestic law. Yet treating customary international law as federal law would alter domestic law because of the Supremacy Clause. All of these problems, and more, including the lack of historical support for the *Filartiga* theory, are spelled out in Curtis A. Bradley & Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position,* 110 HARV. L. REV. 815 (1997), and in a later article by the same authors, *Federal Courts and the Incorporation of International Law,* 111 HARV. L. REV. 2260 (1998). *But see* Harold Hongju Koh, *Is International Law Really State Law?,* 111 HARV. L. REV. 1824 (1998).

As to the history of the Alien Tort Act, Judge Friendly wrote: this "old but little used section is a kind of legal Lohengrin; although it has been with us since the first Judiciary Act, § 9, 1 Stat. 73, 77 (1789), no one seems to know whence it came." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975). The original version read:

> the district courts … shall also have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States.

1 Stat. 73, 76-77 (1789). Two former members of our court thought that § 1350 might have been meant to cover only private, nongovernmental acts taken against aliens such as piracy. *Sanchez-Espinoza*, 770 F.2d at 206 (Scalia, J.); *Tel-Oren*, 726 F.2d at 813-14, 822 (Bork, J., concurring). "[M]ore recent research of a competent scholar" (*Erie R.R.*, 304 U.S. at 72) has shed new light on the origin of § 1350 and the purpose of the First Congress in enacting it. *See* Joseph Modeste Sweeney, *A Tort Only in Violation of the Law of Nations*, 18 HASTINGS INT'L & COMP. L. REV. 445 (1995). Professor Sweeney marshals a vast amount of historical research on eighteenth century "prize law," which allowed private vessels having a marque to capture enemy ships. When the Articles of Confederation were in effect, state courts adjudicated claims by alien shipowners seeking the return of their captured vessels and reparations for the damages caused by the seizure. Adoption of the Constitution and the passage of the First Judiciary Act gave the federal courts exclusive jurisdiction in admiralty and thus exclusive jurisdiction over suits brought to recover ships captured in prize. There was still a question whether state courts had jurisdiction over cases in which the alien sued not for return of the ship, but only for reparations. It was only these cases, Professor Sweeney postulates, that the Alien Tort Act's author, Oliver Ellsworth, and his congressional colleagues, intended to cover by making clear that if the alien shipowner's suit sought only reparations, the state courts would have jurisdiction concurrent with the federal courts. Hence the words in the statute "for a tort only." If Professor Sweeney is correct, the Alien Tort Act today is moribund, as in fact it had been for nearly two hundred years until the Second Circuit resuscitated it.

In view of my doubts about *Filartiga*, and the *Tel-Oren* majority's rejection of it, we might go ahead in this case and

decide what § 1350 does mean. But it is unnecessary to do so, not only because *Eisentrager* disposes of the cases, but also because the detainees' treaty and international law claims are barred by sovereign immunity. Before explaining why, I need to add a disclaimer. At oral argument, the question arose whether next friend status may be recognized for suits under § 1350. "Some courts have permitted 'next friends' to prosecute actions outside the habeas corpus context on behalf of infants, other minors, and adult mental incompetents." *Whitmore v. Arkansas*, 495 U.S. 149, 162 n.4 (1990). Here, the argument for the next friend device is that the detainees are allegedly barred from talking with anyone about bringing lawsuits on their behalf. The parties have not briefed the questions this argument raises and I express no opinion on its validity.

The United States or its officers may be sued only if there is a waiver of sovereign immunity. *See, e.g.*, *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). We have held that the Alien Tort Act, whatever its meaning, does not itself waive sovereign immunity. *Industria Panificadora, S.A. v. United States*, 957 F.2d 886, 886 (D.C. Cir. 1992) (per curiam); *Sanchez-Espinoza*, 770 F.2d at 207; *see Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980). The detainees therefore rely on the waiver provision in the Administrative Procedure Act, 5 U.S.C. § 702, which states: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity ... shall not be dismissed ... on the ground that it is against the United States...."

Although relying on the APA's waiver for agencies, the detainees do not identify which "agency" of the United States they have in mind. They have sued the President in each case, but the President is not an "agency" under the APA and the waiver of sovereign immunity thus does not apply to him. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). This leaves the military. The APA specifically excludes from its definition of "agency" certain functions, among which is "mili-

tary authority exercised in the field in time of war or in occupied territory." 5 U.S.C. §§ 551(1)(G), 701(b)(1)(G); *see id.* §§ 553(a)(1) & 554(a)(4), exempting military "functions" from the APA's requirements for rulemaking and adjudication; *United States ex rel. Schonbrun v. Commanding Officer*, 403 F.2d 371, 375 n.2 (2d Cir. 1968) (Friendly, J.). The district court ruled, in an alternative holding, that because of the military function exclusion, the APA does not waive sovereign immunity. *Rasul v. Bush*, 215 F. Supp. 2d 55, 64 n.10 (D.D.C. 2002). I believe this is correct.

Each of the detainees, according to their pleadings, was taken into custody by American armed forces "in the field in time of war." I believe they remain in custody "in the field in time of war." It is of no moment that they are now thousands of miles from Afghanistan. Their detention is for a purpose relating to ongoing military operations and they are being held at a military base outside the sovereign territory of the United States. The historical meaning of "in the field" was not restricted to the field of battle. It applied as well to "organized camps stationed in remote places where civil courts did not exist," *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 274 (1960) (Whittaker, J., joined by Stewart, J., concurring in part and dissenting in part). To allow judicial inquiry into military decisions after those captured have been moved to a "safe" location would interfere with military functions in a manner the APA's exclusion meant to forbid. We acknowledged as much in *Doe v. Sullivan*, 938 F.2d 1370, 1380 (D.C. Cir. 1991), when then-Judge Ruth Bader Ginsburg stated for the court that the APA's military function exclusion applied to cases in which a court was asked to "review military commands made . . . in the aftermath of [ ] battle." It is also of no moment that the detainees were captured without Congress having declared war against any foreign state. "Time of war," as the APA uses it, is not so confined. The military actions ordered by the President, with the approval of Congress, are continuing; those military actions are part of the war against the al Qaeda terrorist network; and those actions constitute "war," not necessarily as the Constitution uses the word, but as the APA uses it.

*See Campbell v. Clinton*, 203 F.3d 19, 29-30 (D.C. Cir. 2000) (Randolph, J., concurring in the judgment); *Mitchell v. Laird*, 488 F.2d 611, 613 (D.C. Cir. 1973). The detainees are right not to contest this point. To hold that it is not "war" in the APA sense when the United States commits its armed forces into combat without a formal congressional declaration of war would potentially thrust the judiciary into reviewing military decision-making in places and times the APA excluded from its coverage.

I would therefore hold that the detainees cannot invoke the APA's waiver of sovereign immunity and that the district court correctly dismissed their claims under the Alien Tort Act for this additional reason.

I would also hold that the judicial review provisions of the APA, including the waiver of sovereign immunity, do not apply because the military decisions challenged here are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exclusion applies when "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The military's judgment about how to confine the detainees necessarily depends upon " 'a complicated balancing of a number of factors which are particularly within its expertise.' " *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting *Heckler*, 470 U.S. at 831). The level of threat a detainee poses to United States interests, the amount of intelligence a detainee might be able to provide, the conditions under which the detainee may be willing to cooperate, the disruption visits from family members and lawyers might cause – these types of judgments have traditionally been left to the exclusive discretion of the Executive Branch, and there they should remain. *See Nat'l Fed'n of Fed. Employees v. United States*, 905 F.2d 400, 406 (D.C. Cir. 1990); *Schonbrun*, 403 F.2d at 375 n.2.