**Salim Ahmed HAMDAN, Plaintiff,**

v.

**Donald H. RUMSFELD, Defendant.**

**No. CIV.A.04–1519 JR.**

United States District Court,
District of Columbia.

Nov. 8, 2004.

Joseph M. Mcmillan, Perkins Coie LLP, Seattle, WA, Neal Katyal, Kelly A. Cameron, Perkins Coie, LLP, Washington, DC, for Plaintiff.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, Preeya M. Noronha, U.S. De-

partment of Justice, Terry Marcus Henry, Washington, DC, for Defendant.

## MEMORANDUM OPINION

ROBERTSON, District Judge.

Salim Ahmed Hamdan petitions for a writ of habeas corpus, challenging the lawfulness of the Secretary of Defense's plan to try him for alleged war crimes before a military commission convened under special orders issued by the President of the United States, rather than before a court-martial convened under the Uniform Code of Military Justice. The government moves to dismiss. Because Hamdan has not been determined by a competent tribunal to be an offender triable under the law of war, 10 U.S.C. § 821, and because in any event the procedures established for the Military Commission by the President's order are "contrary to or inconsistent" with those applicable to courts-martial, 10 U.S.C. § 836, Hamdan's petition will be **granted** in part. The government's motion will be **denied**. The reasons for these rulings are set forth below.

## BACKGROUND

Hamdan was captured in Afghanistan in late 2001, during a time of hostilities in that country that followed the terrorist attacks in the United States on September 11, 2001 mounted by al Qaeda, a terrorist group harbored in Afghanistan. He was detained by American military forces and transferred sometime in 2002 to the detention facility set up by the Defense Department at Guantanamo Bay Naval Base, Cuba. On July 3, 2003, acting pursuant to the Military Order he had issued on November 13, 2001,[1] and finding "that there is reason to believe that [Hamdan] was a member of al Qaida or was otherwise involved in terrorism directed against the United States," the President designated Hamdan for trial by military commission. Press Release, Dep't of Defense, President Determines Enemy Combatants Subject to His Military Order (July 3, 2003), http://www.defenselink.mil/releases/2003/nr20030703–0173.html. In December 2003, Hamdan was placed in a part of the Guantanamo Bay facility known as Camp Echo, where he was held in isolation. On December 18, 2003, military counsel was appointed for him. On February 12, 2004, Hamdan's counsel filed a demand for charges and speedy trial under Article 10 of the Uniform Code of Military Justice. On February 23, 2004, the legal advisor to the Appointing Authority[2] ruled that the UCMJ did not apply to Hamdan's detention. On April 6, 2004, in the United States District Court for the Western District of Washington, Hamdan's counsel filed the petition for mandamus or habeas corpus that is now before this court. On July 9, 2004, Hamdan was formally charged with conspiracy to commit the

---

**1.** Detention, Treatment, and Trial of Certain Non–Citizens in the War Against Terrorism, 66 Fed.Reg. 57,833 (Nov. 13, 2001).

**2.** The Department of Defense has implemented the President's Military Order of November 3, 2001 with a series of Military Commission Orders, Instructions, and other documents. *See generally* Dep't of Defense, Military Commissions (providing extensive links to background materials on the Military Commissions), *at* http://www.defenselink.mil/news/commissions.html. The Secretary of Defense may designate an "Appointing Authority" to issue orders establishing and regulating military commissions. Military Commission Order No. 1 (March 21, 2002), 32 C.F.R. § 9.2, http://www.defenselink.mil/news/Mar2002/d20020321ord.pdf. Secretary Rumsfeld designated John D. Altenburg, Jr. as Appointing Authority. Press Release, Dep't of Defense, Appointing Authority Decision Made (December 30, 2003), http://www.defenselink.mil/releases/2003/nr20031230–0820.html.

following offenses: "attacking civilians; attacking civilian objects; murder by an unprivileged belligerent; destruction of property by an unprivileged belligerent; and terrorism." Dep't of Defense, Military Commission List of Charges for Salim Ahmed Hamdan, http://www.defenselink.mil/news/Jul2004/d20040714hcc.pdf. Following the Supreme Court's decision on June 28, 2004, that federal district courts have jurisdiction of habeas petitions filed by Guantanamo Bay detainees, *Rasul v. Bush*, —— U.S. ——, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), and the Ninth Circuit's decision on July 8, 2004, that all such cases should be heard in the District of the District of Columbia, *Gherebi v. Bush*, 374 F.3d 727 (9th Cir.2004), the case was transferred here, where it was docketed on September 2, 2004.[3] Oral argument was held on October 25, 2004.

Hamdan's petition is stated in eight counts. It alleges the denial of Hamdan's speedy trial rights in violation of Article 10 of the Uniform Code of Military Justice, 10 U.S.C. § 810 (count 1); challenges the nature and length of Hamdan's pretrial detention as a violation of the Third Geneva Convention (count 2) and of Common Article 3 of the Geneva Conventions (count 3); challenges the order establishing the Military Commission as a violation of the separation of powers doctrine (count 4) and as purporting to invest the Military Commission with authority that exceeds the law of war (count 7); challenges the creation of the Military Commission as a violation of the equal protection guarantees of the Fifth Amendment (count 5) and of 42 U.S.C. § 1981 (count 6); and argues that the Military Order does not, on its face, apply to Hamdan (count 8).

Although Judge Lasnik (W.D.Wash.) ordered the respondents to file a "return," Order Granting Motion to Hold Petition in Abeyance (W.D.Wash. No. 04–0777) (May 11, 2004), and although the motion to dismiss now before this court is styled a "consolidated return to petition and memorandum of law in support of cross-motion to dismiss," no formal show cause order has issued, nor have the respondents ever filed a factual response to Hamdan's allegations. An order issued October 4, 2004 [Dkt # 26] by Judge Joyce Hens Green, who is coordinating and managing all of the Guantanamo Bay cases in this court, provided that "[r]espondents are not required ... to file a response addressing enemy combatant status issues ... or a factual return providing the factual basis for petitioner's detention as an enemy combatant, pending further order of the Court."[4] The absence of a factual return is of no moment, however. The issues before me will be resolved as a matter of law. The only three facts that are necessary to my disposition of the petition for habeas corpus and of the cross-motion to dismiss are that Hamdan was captured in Afghanistan during hostilities after the 9/11 attacks, that he has asserted his entitlement to prisoner-of-war status under the Third Geneva Convention, and that the government has not convened a competent tribunal to determine whether Hamdan is entitled to such status. All of those propositions appear to be undisputed.

---

**3.** Hamdan's counsel, Charles Swift, initially filed the petition in this case in his own name as Hamdan's next friend. The government challenged Swift's standing to do so. At a conference on September 14, 2004, the petition was amended, by consent and *nunc pro tunc,* to be in Hamdan's name only.

**4.** This order was issued only for the instant case, because briefing of these motions was nearly complete and the issues they raised did not require factual returns. Factual returns must be filed in all of the other Guantanamo detainee cases pending in this court.

## ANALYSIS

### 1. Abstention is neither required nor appropriate.

■ The well-established doctrine that federal courts will "normally not entertain habeas petitions by military prisoners unless all available military remedies have been exhausted," *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), is not applicable here. *Councilman* involved a court-martial, not a military commission. Its holding is that, "when a serviceman charged with crimes by military authorities can show no harm other than that attendant to resolution of his case in the military court system, the federal district courts must refrain from intervention . . . ." *Id.* at 758, 95 S.Ct. 1300. In reaching that conclusion, the Court found it necessary to distinguish its previous decisions in *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (civilian ex-serviceman not triable by court-martial for offense committed while in service), *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (civilian dependent not triable by court-martial for murder of service member husband overseas in peacetime), and *McElroy v. United States. ex rel. Guagliardo*, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960) (civilian employees of armed forces overseas not subject to court-martial jurisdiction for noncapital offenses), none of which required exhaustion. The *Councilman* Court also repeated its observation in *Noyd v. Bond*, 395 U.S. 683, 696 n. 8, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969), that it is "especially unfair to require exhaustion . . . when the complainants raised substantial arguments denying the right of the military to try them at all." A jurisdictional argument is just what Hamdan present here.

Controlling Circuit precedent is found in *New v. Cohen*, 129 F.3d 639, 644 (D.C.Cir. 1997). In that case, following the Supreme Court's decision in *Parisi v. Davidson*, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972), the Court of Appeals noted that, although the abstention rule is often " 'framed in terms of 'exhaustion' it may more accurately be understood as based upon the appropriate demands of comity between two separate judicial systems.' " *Id.* at 642, (quoting *Parisi*, 405 U.S. at 40, 92 S.Ct. 815).

None of the policy factors identified by the Supreme Court as supporting the doctrine of comity is applicable here. *See Parisi*, 405 U.S. at 41, 92 S.Ct. 815, discussed in *New*, 129 F.3d at 643. In the context of this case, according comity to a military tribunal would not "aid[ ] the military judiciary in its task of maintaining order and discipline in the armed services," or "eliminate[ ] needless friction between the federal civilian and military judicial systems," nor does it deny "due respect to the autonomous military judicial system created by Congress," because, whatever else can be said about the Military Commission established under the President's Military Order, it is not autonomous, and it was not created by Congress. *Parisi*, 405 U.S. at 40, 92 S.Ct. 815.

■ The *New* case identifies an exception to the exhaustion rule that it characterizes as "quite simple: a person need not exhaust remedies in a military tribunal if the military court has no jurisdiction over him." *New*, 129 F.3d at 644. That rule, squarely based on the Supreme Court's opinions in *McElroy*, *Reid*, and *Toth, supra*, applies here. Even *Councilman* supports the proposition that a district court should at least determine whether the petitioner has " 'raised substantial arguments denying the right of the military to try [him] at all.' " 420 U.S. at 763, 95 S.Ct. 1300 (quoting *Noyd v. Bond,*

395 U.S. at 696 n. 8, 89 S.Ct. 1876). Having done so, and having considered Hamdan's arguments that he is not triable by military commission at all, I conclude that abstention is neither required nor appropriate as to the issues resolved by this opinion.

**2. No proper determination has been made that Hamdan is an offender triable by military tribunal under the law of war.**

a. *The President may establish military commissions only for offenders or offenses triable by military tribunal under the law of war.*

■ The major premise of the government's argument that the President has untrammeled power to establish military tribunals is that his authority emanates from Article II of the Constitution and is inherent in his role as commander-in-chief. None of the principal cases on which the government relies, *Ex parte Quirin*, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942), *Application of Yamashita*, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946), and *Madsen v. Kinsella*, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988 (1952), has so held. In *Quirin* the Supreme Court located the power in Article I, § 8, emphasizing the President's *executive* power as commander-in-chief "to wage war which *Congress* has declared, and to carry into effect all laws passed by *Congress* for the conduct of war and for the government and regulation of the Armed Forces, and all laws defining and punishing offences against the law of nations, including those which pertain to the conduct of war." *Quirin*, 317 U.S. at 26, 63 S.Ct. at 10 (emphasis added). *Quirin* stands for the proposition that the authority to appoint military commissions is found, not in the inherent power of the presidency, but in the Articles of War (a predecessor of the Uniform Code of Mili-

tary Justice) by which *Congress* provided rules for the government of the army. *Id.* Thus, *Congress* provided for the trial by courts-martial of members of the armed forces and specific classes of persons associated with or serving with the army, *id.*, and "the *Articles* [*of War*] also recognize the 'military commission' appointed by military command as an appropriate tribunal for the trial and punishment of offenses against the law of war not ordinarily tried by court martial." *Id.* The President's authority to prescribe procedures for military commissions was conferred by Articles 38 and 46 of the Articles of War. *Id.* The *Quirin* Court sustained the President's order creating a military commission, because "[b]y his Order creating the ... Commission [the President] has undertaken to exercise the authority conferred upon him by *Congress* ...." *Id.* at 28, 63 S.Ct. at 11.

This sentence continues with the words "... and also such authority as the Constitution itself gives the Commander in Chief, to direct the performance of those functions which may constitutionally be performed by the military arm of the nation in time of war." *Id.* at 28, 63 S.Ct. at 11. That dangling idea is not explained—in *Quirin* or in later cases. The Court expressly found it unnecessary in *Quirin* "to determine to what extent the President as Commander in Chief has constitutional power to create military commissions without the support of Congressional legislation. For here Congress has authorized trial of offenses against the law of war before such commissions." *Id.*

In *Yamashita*, the Supreme Court noted that it had "had occasion [in *Quirin*] to consider at length the sources and nature of the authority to create military commissions for the trial of enemy combatants for offenses against the law of war," *Yamashi-*

*ta,* at 327 U.S. at 7, 66 S.Ct. 340, and noted:

> [W]e there pointed out that *Congress,* in the exercise of the power conferred upon it by Article I, § 8 Cl. 10 of the Constitution to 'define and punish ... Offenses against the Law of Nations ...,' of which the law of war is a part, had by the Articles of War [citation omitted] recognized the 'military commission' appointed by military command as it had previously existed in United States Army practice, as an appropriate tribunal for the trial and punishment of offenses against the law of war.

*Id.* at 7, 66 S.Ct. 340 (emphasis added). Further on, the Court noted:

> We further pointed out that *Congress,* by sanctioning trial of enemy combatants for violations of the law of war by military commission, had not attempted to codify the law of war or to mark its precise boundaries. Instead, by Article 15 it had incorporated, by reference, as within the preexisting jurisdiction of military commissions created by appropriate military command, all offenses which are defined as such by the law of war, and which may constitutionally be included within that jurisdiction. It thus adopted the system of military common law applied by military tribunals so far as it should be recognized and deemed applicable by the courts, and as further defined and supplemented by the Hague Convention, to which the United States and the Axis powers were parties."

*Id.* at 7–8, 66 S.Ct. 340 (emphasis added). And again:

> *Congress,* in the exercise of its constitutional power to define and punish offenses against the law of nations, of which the law of war is a part, has recognized the 'military commission' appointed by military command, as it had previously existed in United States

Army practice, as an appropriate tribunal for the trial and punishment of offenses against the law of war.

*Id.* at 16, 66 S.Ct. 340 (emphasis added). *Yamashita* concluded that, by giving "sanction ... to any use of the military commission contemplated by the common law of war," *Congress* "preserve[d] their traditional jurisdiction over enemy combatants unimpaired by the Articles [of War]...." *Id.* at 20, 66 S.Ct. 340.

What was then Article 15 of the Articles of War is now Article 21 of the Uniform Code of Military Justice, 10 U.S.C. § 821. It provides:

> **The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals.**

*Quirin* and *Yamashita* make it clear that Article 21 represents Congressional approval of the historical, traditional, nonstatutory military commission. The language of that approval, however, does not extend past "offenders or offenses that by statute or by the law of war may be tried by military commissions ...." 10 U.S.C. § 821.

Any additional jurisdiction for military commissions would have to come from some inherent executive authority that *Quirin, Yamashita,* and *Madsen* neither define nor directly support. If the President does have inherent power in this area, it is quite limited. Congress has the power to amend those limits and could do so tomorrow. Were the President to act outside the limits now set for military commissions by Article 21, however, his actions would fall into the most restricted category of cases identified by Justice

Jackson in his concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), in which "the President takes measures incompatible with the expressed or implied will of Congress," and in which the President's power is "at its lowest ebb."[5]

b. *The law of war includes the Third Geneva Convention, which requires trial by court-martial as long as Hamdan's POW status is in doubt.*

"From the very beginning of its history this Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals."

This language is from *Quirin*, 317 U.S. at 27–28, 63 S.Ct. 2. The United States has ratified the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949, 6 U.S.T. 3316, 74 U.N.T.S. 135 (the Third Geneva Convention). Afghanistan is a party to the Geneva Conventions.[6] The Third Geneva Convention is acknowledged to be part of the law of war, 10/25/04 Tr. at 55; Military Commission Instruction No. 2, § (5)(G) (Apr. 30, 2003); 32 C.F.R. § 11.5(g), http://www.defensel ink.mil/news/May2003/d20030430mil-cominstno2.pdf. It is applicable by its terms in "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them." Third Geneva Convention, art. 2. That language

covers the hostilities in Afghanistan that were ongoing in late 2001, when Hamdan was captured there. If Hamdan is entitled to the protections accorded prisoners of war under the Third Geneva Convention, one need look no farther than Article 102 for the rule that requires his habeas petition to be granted:

**A prisoner of war can be validly sentenced only if the sentence has been pronounced by the same courts according to the same procedure as in the case of members of the armed forces of the Detaining Power, and if, furthermore, the provisions of the present Chapter have been observed.**[7]

The Military Commission is not such a court. Its procedures are not such procedures.

The government does not dispute the proposition that prisoners of war may not be tried by military tribunal. Its position is that Hamdan is not entitled to the protections of the Third Geneva Convention at all, and certainly not to prisoner-of-war status, and that in any event the protections of the Third Geneva Convention are not enforceable by way of habeas corpus.

(1) The government's first argument that the Third Geneva Convention does not protect Hamdan asserts that Hamdan was captured, not in the course of a conflict between the United States and Afghanistan, but in the course of a "separate" conflict with al Qaeda. That argument is rejected. The government apparently bases the argument on a Presidential "finding" that it claims is "not reviewable." *See* Motion to Dismiss

---

5. For further development of this argument, see Brief Amici Curiae of Sixteen Law Professors at 9–13.

6. *See* International Committee of the Red Cross, Treaty Database, *at* http://www.icrc.org/ihl.

7. *See* Brief Amici Curiae of Sixteen Law Professors at 28–30.

at 33, *Hicks v. Bush* (D.D.C. No. 02–00299) (October 14, 2004). The finding is set forth in Memorandum from the President, to the Vice President *et al.*, Humane Treatment of al Qaeda and Taliban Detainees(February 7, 2002), http://www.library.law.pace.edu/research/020207_bushmemo.pdf, stating that the Third Geneva Convention applies to the Taliban detainees, but not to the al Qaeda detainees captured in Afghanistan, because al Qaeda is not a state party to the Geneva Conventions. Notwithstanding the President's view that the United States was engaged in two separate conflicts in Afghanistan (the common public understanding is to the contrary, *see* Joan Fitzpatrick, Jurisdiction of Military Commissions and the Ambiguous War on Terrorism, 96 Am. J. Int'l. L. 345, 349 (2002) (conflict in Afghanistan was international armed conflict in which Taliban and al Qaeda joined forces against U.S. and its Afghan allies)), the government's attempt to separate the Taliban from al Qaeda for Geneva Convention purposes finds no support in the structure of the Conventions themselves, which are triggered by the place of the conflict, and not by what particular faction a fighter is associated with. *See* Amicus Brief of General David M. Brahms (ret.), Admiral Lee F. Gunn (ret.), Admiral John D. Hutson (ret.), General Richard O'Meara (ret.) (Generals and Admirals Amicus Brief) at 17 (citing Memorandum from William H. Taft IV, Legal Adviser, Dep't of State, to Counsel to the President ¶ 3 (Feb. 2, 2002), http://www.fas.org/sgp/othergov/taft.pdf). Thus at some level—whether as a prisoner-of-war entitled to the full panoply of Convention protections or only under the more limited protections afforded by Common Article 3, *see infra* note 13—the Third Geneva Convention applies to all persons detained in Afghanistan during the hostilities there.

(2) The government next argues that, even if the Third Geneva Convention might theoretically apply to anyone captured in the Afghanistan theater, members of al Qaeda such as Hamdan are not entitled to POW status because they do not satisfy the test established by Article 4(2) of the Third Geneva Convention—they do not carry arms openly and operate under the laws and customs of war. Gov't Resp. at 35. *See also* The White House, Statement by the Press Secretary on the Geneva Convention (May 7, 2003), http://www.whitehouse.gov/news/releases/2003/05/20030507–18.html. We know this, the government argues, because the President himself has determined that Hamdan was a member of al Qaeda or otherwise involved in terrorism against the United States. *Id.* Presidential determinations in this area, the government argues, are due "extraordinary deference." 10/25/04 Tr. at 38. Moreover (as the court was advised for the first time at oral argument on October 25, 2004) a Combatant Status Review Tribunal (CSRT) found, after a hearing on October 3, 2004, that Hamdan has the status of an enemy combatant "as either a member of or affiliated with Al Qaeda." 10/25/04 Tr. at 12.

Article 5 of the Third Geneva Convention provides:

> **Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4 such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.**

This provision has been implemented and confirmed by Army Regulation 190–8, Enemy Prisoners of War, Retained

Personnel, Civilian Internees and Other Detainees, http://www.army.mil/usa-pa/epubs/pdf/r190_8.pdf., Hamdan has asserted his entitlement to POW status, and the Army's regulations provide that whenever a detainee makes such a claim his status is "in doubt." Army Regulation 190–8, § 1–6(a); *Hamdi,* —— U.S. at ——, 124 S.Ct. at 2658 (Souter, J., concurring). The Army's regulation is in keeping with general international understandings of the meaning of Article 5. *See generally* Generals and Admirals Amicus Brief at 18–22.

Thus the government's position that no doubt has arisen as to Hamdan's status does not withstand scrutiny, and neither does the government's position that, if a hearing is required by Army regulations, "it was provided," 10/25/04 Tr. at 40. There is nothing in this record to suggest that a competent tribunal has determined that Hamdan is not a prisoner-of-war under the Geneva Conventions. Hamdan has appeared before the Combatant Status Review Tribunal, but the CSRT was not established to address detainees' status under the Geneva Conventions. It was established to comply with the Supreme Court's mandate in *Hamdi, supra,* to decide "whether the detainee is properly detained as an enemy combatant" for purposes of continued detention. Memorandum From Deputy Secretary of Defense, to Secretary of the Navy, Order Establishing Combatant Status Review Tribunal 3 (July 7, 2003), http://www.defensel-ink.mil/news/Jul2004/d20040707review.pdf; *see also* Memorandum From Secretary of the Navy, Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba (July 29, 2004), http://www.defensel-ink.mil/news/Jul2004/d20040730comb.pdf.

The government's legal position is that the CSRT determination that Hamdan was a member of or affiliated with al Qaeda is also determinative of Hamdan's prisoner-of-war status, since the President has already determined that detained al Qaeda members are not prisoners-of-war under the Geneva Conventions, *see* 10/25/04 Tr. at 37. The President is not a "tribunal," however. The government must convene a competent tribunal (or address a competent tribunal already convened) and seek a specific determination as to Hamdan's status under the Geneva Conventions. Until or unless such a tribunal decides otherwise, Hamdan has, and must be accorded, the full protections of a prisoner-of-war.

(3) The government's next argument, that Common Article 3 does not apply because it was meant to cover local and not international conflicts, is also rejected.[8]

---

8. Article 3 of the Third Geneva Convention is called "Common Article 3" because it is common to all four of the 1949 Geneva Conventions. It provides:

> In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be found to apply, as a minimum, the following provisions:
>
> (1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sick-ness, wounds, detention, or any other cause, shall in all circumstances be sick-ness, wounds, detention, or any other cause, shall in all circumstances by treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria. To this end the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

It is universally agreed, and is demonstrable in the Convention language itself, in the context in which it was adopted, and by the generally accepted law of nations, that Common Article 3 embodies "international human norms," *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1351 (N.D.Ga. 2002), and that it sets forth the "most fundamental requirements of the law of war." *Kadic v. Karadzic,* 70 F.3d at 232, 243 (2d Cir.1995). The International Court of Justice has stated it plainly: "There is no doubt that, in the event of international armed conflicts ... [the rules articulated in Common Article 3] ... constitute a minimum yardstick, in addition to the more elaborate rules which are also to apply to international conflicts; and they are rules which, in the Court's opinion, reflect what the court in 1949 called 'elementary considerations of humanity.'" *Nicaragua v. United States,* 1986 I.C.J. 14, 114 (Judgment of June 27). The court went on to say that, "[b]ecause the minimum rules applicable to international and non-international conflicts are identical, there is no need to address the question whether ... [the actions alleged to be violative of Common Article 3] must be looked at in the context of the rules which operate for one or the other category of conflict." [9] *Id.*

The government has asserted a position starkly different from the positions and

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
(b) taking of hostages;
(c) outrages upon personal dignity, in particular, humiliating and degrading treatment;
**(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.**
(2) The wounded and sick shall be commected and cared for.

behavior of the United States in previous conflicts, one that can only weaken the United States' own ability to demand application of the Geneva Conventions to Americans captured during armed conflicts abroad. *Amici* remind us of the capture of U.S. Warrant Officer Michael Durant in 1993 by forces loyal to a Somali warlord. The United States demanded assurances that Durant would be treated consistently with protections afforded by the Convention, even though, if the Convention were applied as narrowly as the government now seeks to apply it to Hamdan, "Durant's captors would not be bound to follow the convention because they were not a 'state'". Neil McDonald & Scott Sullivan, Rational Interpretation in Irrational Times: The Third Geneva Convention and "War On Terror", 44 Harv. Int'l. L.J. 301, 310 (2003). Examples of the way other governments have already begun to cite the United States' Guantanamo policy to justify their own repressive policies are set forth in Lawyers Committee for Human Rights, Assessing the New Normal: Liberty and Security for the Post–September 11 United States, at 77–80 (2003).

(4) The government's putative trump card is that Hamdan's rights under the Geneva Conventions, if any, and whatever they are, are not enforceable by this Court—that, in effect, Hamdan has failed

An impartial humanitarian body, such as the International Committee of the Red Cross, may offer its services to the Parties to the conflict.
The Parties to the conflict should further endeavour to bring into force, by means of special agreements, all or part of the other provisions of the present Convention.
The application of the preceding provisions shall not affect the legal status of the Parties to the conflict.

**9.** *See also* Brief Amici of Sixteen Law Professors at 33 n.32.

to state a claim upon which relief can be granted—because the Third Geneva Convention is not "self-executing" and does not give rise to a private cause of action.

As an initial matter, it should be noted Hamdan has not asserted a "private right of action" under the Third Geneva Convention. The Convention is implicated in this case by operation of the statute that limits trials by military tribunal to "offenders . . . triable under the law of war." 10 U.S.C. § 821. The government's argument thus amounts to the assertion that no federal court has the authority to determine whether the Third Geneva Convention has been violated, or, if it has, to grant relief from the violation.

■ Treaties made under the authority of the United States are the supreme law of the land. U.S. Const. art. VI, cl. 2. United States courts are bound to give effect to international law and to international agreements of the United States unless such agreements are "non-self-executing." *The Paquete Habana,* 175 U.S. 677, 708, 20 S.Ct. 290, 44 L.Ed. 320 (1900); Restatement (Third) of the Foreign Relations Law of the United States § 111. A treaty is "non-self-executing" if it manifests an intention that it not become effective as domestic law without enactment of implementing legislation; or if the Senate in consenting to the treaty requires implementing legislation; or if implementing legislation is constitutionally required. *Id.* at § 111(4). The controlling law in this Circuit on the subject of whether or not treaties are self-executing is *Diggs v. Richardson,* 555 F.2d 848 (D.C.Cir.1976), a suit to prohibit the importation of seal furs from Namibia, brought by a citizen plaintiff who sought to compel United States government compliance with a United Nations Security Council resolution calling on member states to have no dealings with South Africa. The decision in that case instructs a court interpreting a treaty to look to the intent of the signatory parties as manifested by the language of the treaty and, if the language is uncertain, then to look to the circumstances surrounding execution of the treaty. *Id.* at 851. *Diggs* relies on the *In re Head Money Cases,* 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884), which established the proposition that a "treaty is a law of the land as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined." *Id.* at 598, 5 S.Ct. 247. The Court in *Diggs* concluded that the provisions of the Security Council resolution were not addressed to the judicial branch of government, that they did not by their terms confer rights on individuals, and that instead the resolution clearly called upon governments to take action. *Diggs,* 555 F.2d at 851.

■ The Geneva Conventions, of course, are all about prescribing rules by which the rights of individuals may be determined. Moreover, as petitioner and several of the *amici* have pointed out, *see, e.g.,* Pet'r's Mem. Supp. of Pet. at 39 n.11, it is quite clear from the legislative history of the ratification of the Geneva Conventions that Congress carefully considered what further legislation, if any, was deemed "required to give effect to the provisions contained in the four conventions," S.Rep. No. 84–9, at 30 (1955), and found that only four provisions required implementing legislation. Articles 5 and 102, which are dispositive of Hamdan's case, *supra,* were not among them. What did require implementing legislation were Articles 129 and 130, providing for additional criminal penalties to be imposed upon those who engaged in "grave" violations of the Conventions, such as torture, medical experiments, or "wilful" denial of Convention protections, none of which is

involved here. Third Geneva Convention, art. 130. Judge Bork must have had those provisions in mind, together with Congress' response in enacting the War Crimes Act, 18 U.S.C. § 2441, when he found that the Third Geneva Convention was not self-executing because it required "implementing legislation." *Tel–Oren v. Libyan Arab Republic, et al.,* 726 F.2d 774, 809 (D.C.Cir.1984) (Bork, J., concurring). That opinion is one of three written by a three-judge panel, none of which was joined by any other member of the panel. It is not Circuit precedent and it is, I respectfully suggest, erroneous. "Some provisions of an international agreement may be self-executing and others non-self-executing." Restatement (Third) of Foreign Relations Law of the United States § 111 cmt. h.[10]

\*     \*     \*     \*     \*     \*

■ Because the Geneva Conventions were written to protect individuals, because the Executive Branch of our government has implemented the Geneva Conventions for fifty years without questioning the absence of implementing legislation, because Congress clearly understood that the Conventions did not require implementing legislation except in a few specific areas, and because nothing in the Third Geneva Convention itself manifests the contracting parties' intention that it not become effective as domestic law without the enactment of implementing legislation, I conclude that, insofar as it is pertinent here, the Third Geneva Convention is a self-executing treaty.[11] I further conclude

that it is at least a matter of some doubt as to whether or not Hamdan is entitled to the protections of the Third Geneva Convention as a prisoner of war and that accordingly he must be given those protections unless and until the "competent tribunal" referred to in Article 5 concludes otherwise. It follows from those conclusions that Hamdan may not be tried for the war crimes he is charged with except by a court-martial duly convened under the Uniform Code of Military Justice.

    c.   *Abstention is appropriate with respect to Hamdan's rights under Common Article 3.*

■ There is an argument that, even if Hamdan does not have prisoner-of-war status, Common Article 3 would be violated by trying him for his alleged war crimes in this Military Commission. Abstention is appropriate, and perhaps required, on that question, because, unlike Article 102, which unmistakably mandates trial of POW's only by general court-martial and thus implicates the jurisdiction of the Military Commission, the Common Article 3 requirement of trial before a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples" has no fixed, term-of-art meaning. A substantial number of rights and procedures conferred by the UCMJ are missing from the Military Commission's rules. *See infra* note 12; Generals and Admirals Amicus Brief at 24. I am aware of no authority

---

**10.** The observation in *Al–Odah v. United States,* 321 F.3d 1134, 1147 (D.C.Cir.2003), that the Third Geneva Convention is not self-executing merely relies on the reasons stated by Judge Bork in *Tel–Oren,* 726 F.2d at 809. Since that observation was not essential to the outcome in *Al–Odah,* and since in any event *Al–Odah* was reversed by the Supreme Court, I am not bound by it.

**11.** Hamdan is a citizen of Yemen. The government has refused permission for Yemeni diplomats to visit Hamdan at Guantanamo Bay. Decl. of Lieutenant Commander Charles Swift at 4 (May 3, 2004). It ill behooves the government to argue that enforcement of the Geneva Convention is only to be had through diplomatic channels.

that defines the word "guarantees" in Common Article 3 to mean that all of these rights must be guaranteed in advance of trial. Only Hamdan's right to be present at every phase of his trial and to see all the evidence admitted against him is of immediate pretrial concern. That right is addressed in the next section of this opinion.

3. **In at least one critical respect, the procedures of the Military Commission are fatally contrary to or inconsistent with those of the Uniform Code of Military Justice.**

In most respects, the procedures established for the Military Commission at Guantanamo under the President's order define a trial forum that looks appropriate and even reassuring when seen through the lens of American jurisprudence. The rules laid down by Military Commission Order No. 1, 32 C.F.R. § 9.3, provide that the defendant shall have appointed military counsel, that he may within reason choose to replace "detailed" counsel with another military officer who is a judge advocate if such officer is available, that he may retain a civilian attorney if he can afford it, that he must re-

ceive a copy of the charges in a language that he understands, that he will be presumed innocent until proven guilty, that proof of guilt must be beyond a reasonable doubt, that he must be provided with the evidence the prosecution intends to introduce at trial and with any exculpatory evidence known to the prosecution, with important exceptions discussed below, that he is not required to testify at trial and that the Commission may not draw an adverse inference from his silence, that he may obtain witnesses and documents for his defense to the extent necessary and reasonably available, that he may present evidence at trial and cross-examine prosecution witnesses, and that he may not be placed in jeopardy twice for any charge as to which a finding has become final. *Id.* at §§ 9.4 and 9.5.

The Military Commission is remarkably different from a court-martial, however, in two important respects. The first has to do with the structure of the reviewing authority after trial; the second, with the power of the appointing authority or the presiding officer to exclude the accused from hearings and deny him access to evidence presented against him.[12]

---

**12.** A great many other differences are identified and discussed in David Glazier, Kangaroo Court or Competent Tribunal? Judging the 21st Century Military Commission, 89 Va. L.Rev.2005, 2015–2020 (2003). Differences include (not an exhaustive list):

Article 16 requires that every court-martial consist of a military judge and no less than five members, as opposed to the Military Commission rules that require only three members. Military Commission Order No. 1(4)(A); Article 10 of the UCMJ provides a speedy trial right, while the Military Commission rules provide none. Article 13 states that pre-trial detention should not be more rigorous than required to ensure defendant's presence, while the Commission rules contain no such provision and, in fact, Hamdan was held in solitary confinement in Camp Echo for over 10 months. Article 30 states that

charges shall be signed by one with personal knowledge of them or who has investigated them. The Military Commission rules include no such requirement. Article 31 provides that the accused must be informed before interrogation of the nature of the accusation, his right not to make any statement, and that statements he makes may be used in proceedings against him, and further provides that statements taken from the accused in violation of these requirements may not be received in evidence at a military proceeding. The Military Commission rules provide that the accused may not be forced to testify at his own trial, but the rule does not "preclude admission of evidence of prior statements or conduct of the Accused." Military Commission Order No. 1(5)(F). Article 33 states that the accused will receive notice of the charges against him within eight days of being arrest-

■ Petitioner's challenge to the first difference is unsuccessful. It is true that the President has made himself, or the Secretary of Defense acting at his direction, the final reviewing authority, whereas under the Uniform Code of Military Justice there would be two levels of independent review by members of the Third Branch of government—an appeal to the Court of Appeals for the Armed Forces, whose active bench consists of five civilian judges, and possible review by the Supreme Court on writ of *certiorari.* The President has, however, established a Review Panel that will review the trial record and make a recommendation to the Secretary of Defense, or, if the panel finds an error of law, return the case for further proceedings. The President has appointed to that panel some of the most distinguished civilian lawyers in the country (who may receive temporary commissions to fulfill the requirement that they be "officers," *see* Military Commission Order No. 1(6)(H); 32 C.F.R. § 9.6(h)).[13] And, as for the President's naming himself or the Secretary of Defense as the final reviewing authority, that, after all, is what a military commission is. If Hamdan is triable by any military tribunal, the fact that final review of a finding of guilt would reside in the President or his designee is not "contrary to or inconsistent with" the UCMJ.

■ The second difference between the procedures adopted for the Military Commission and those applicable in a court-martial convened under the Uniform Code of Military Justice is far more troubling. That difference lies in the treatment of information that is classified; information that is otherwise "protected"; or information that might implicate the physical safety of participants, including witnesses, or the integrity of intelligence and law enforcement sources and methods, or "other national security interests." *See* Military Commission Order No. 1(6)(B)(3); 32 C.F.R. § 9.6(b). Under the Secretary of Defense's regulations, the Military Commission must "[h]old open proceedings except where otherwise decided by the Appointing Authority or the Presiding Officer." *Id.* Detailed military defense counsel may not be excluded from proceedings, nor may evidence be received

---

ed or confined unless written reason is given why this is not practicable. The Military Commission rules include no such requirement, and in fact, Hamdan, after being moved to Camp Echo for pre-commission detainment, was not notified of the charges against him for over 6 months. Article 38 provides the accused with certain rights before charges brought against him may be "referred" for trial, which include the right to counsel and the right to present evidence on his behalf. The Military Commission rules provide for no pre-trial referral process at all. Article 41 gives each side one peremptory challenge, while the Military Commission rules provide for none. Article 42 requires all trial participants to take an oath to perform their duties faithfully. The Military Commission rules allow witnesses to testify without taking an oath. Military Commission Order No. 1(6)(D). Article 52 requires three-fourths concurrence to impose a life sentence. The Military Commission rules only require two-thirds concurrence of the members to impose such a sentence. Military Commission Order No. 1(6)(F). Article 26 provides that military judges do not vote on guilt or innocence. Under the Military Commission rules, the Presiding Officer is a voting member of the trial panel. Military Commission Order No. 1(4)(A).

13. Griffin B. Bell, a former United States Circuit Judge and Attorney General; William T. Coleman, Jr., a former Secretary of Transportation; Edward George Biester, Jr., a former Congressman, former Pennsylvania Attorney General, and current Pennsylvania Judge; and Frank J. Williams, Chief Justice of the Rhode Island Supreme Court. *See* Dep't of Defense, Military Commission Biographies, http:// www.defenselink.mil/news/Aug2004/commissions_biographies.html.

that has not been presented to detailed defense counsel, Military Commission Order No. 1(6)(B)(3), (6)(D)(5); 32 C.F.R. §§ 9.6(b)(3), (d)(5). *The accused himself may be excluded from proceedings,* however, and evidence may be adduced that he will never see (because his lawyer will be forbidden to disclose it to him). *See id.*

Thus, for example, testimony may be received from a confidential informant, and Hamdan will not be permitted to hear the testimony, see the witness's face, or learn his name. If the government has information developed by interrogation of witnesses in Afghanistan or elsewhere, it can offer such evidence in transcript form, or even as summaries of transcripts. *See* Military Commission Order No. 1(6)(D); 32 C.F.R. § 9.6(d). The Presiding Officer or the Appointing Authority may receive it in evidence if it meets the "reasonably probative" standard but forbid it to be shown to Hamdan. *See id.* As counsel for Hamdan put it at oral argument, portions of Mr. Hamdan's trial can be conducted "outside his presence. He can be excluded, not for his conduct, [but] because the government doesn't want him to know what's in it. They make a great big deal out of I can be there, but anybody who's practiced trial law, especially criminal law, knows that where you get your cross examination questions from is turning to your client and saying, 'Did that really happen? Is that what happened?' I'm not permitted to do that." 10/25/04 Tr. at 97.

▆▆▆ It is obvious beyond the need for citation that such a dramatic deviation from the confrontation clause could not be countenanced in any American court, particularly after Justice Scalia's extensive opinion in his decision this year in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). It is also apparent that the right to trial "in one's presence" is established as a matter of international humanitarian and human rights law.[14] But it is unnecessary to consider whether Hamdan can rely on any American constitutional notions of fairness, or whether the nature of these proceedings really is, as counsel asserts, akin to the Star Chamber, 10/25/04 Tr. at 97 (and violative of Common Article 3), because—at least in this critical respect—the rules of the Military Commission are fatally "contrary to or inconsistent with" the statutory requirements for courts-martial convened under the Uniform Code of Military Justice, and thus unlawful.

In a general court-martial conducted under the UCMJ, the accused has the right to be present during sessions of the court:

**When the members of a court-martial deliberate or vote, only the members may be present. *All other proceedings,* including any other consultation of the members of the court with counsel or the military judge, shall be made a part of the record and *shall be in the presence of the accused,* the defense counsel, the trial counsel, and, in cases in which a military judge has**

---

**14.** International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171, art. 14(d)(3); Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 3, art. 75.4(e). "This includes, at a minimum, all hearings in which the prosecutor participates. *E.g.,* Eur.Ct.H.Rts., *Belziuk v. Poland,* App. No. 00023103/93, Judgment of 25 March 1998, para. 39." Brief Amici Curiae of Louise Doswald–Beck *et al.* at 32–33 n.137. In this country, as Justice Scalia noted in *Crawford v. Washington,* 541 U.S. at ——, 124 S.Ct. at 1363, the right to be present was held three years after the adoption of the Sixth Amendment to be a rule of common law "founded on natural justice" (quoting from *State v. Webb,* 2 N.C. 103, 1794 WL 98 (1794)).

been detailed to the court, the military judge.

UCMJ Article 39(b), 10 U.S.C. § 839(b) (emphasis added).

Article 36 of the Uniform Code of Military Justice, 10 U.S.C. § 836(a), provides:

> Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter triable in courts-martial, military commissions and other military tribunals, and procedures for courts of inquiry, may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be *contrary to or inconsistent with* this chapter. (Emphasis added.)

The government argues for procedural "flexibility" in military commission proceedings, asserting that

> construing Article 36 rigidly to mean that there can be no deviation from the UCMJ ... would have resulted in having virtually all of the UCMJ provisions apply to the military commissions, which would clearly be in conflict with historical practice, as recognized by the Supreme Court, in both *Yamashita* and *Madsen*, and also inconsistent with Congress' intent, as reflected in Articles 21 and 36, and other provisions of the UCMJ that specifically mention commissions when a particular rule applies to them.

10/25/04 Tr. 26–27. But the language of Article 36 does not require rigid adherence to all of the UCMJ's rules for courts-martial. It proscribes only procedures and modes of proof that are "contrary to or inconsistent with" the UCMJ.[15]

As for the government's reliance on *Yamashita* and *Madsen: Yamashita* offers support for the government's position only if developments between 1946 and 2004 are ignored. In 1946, the Supreme Court held that Article 38 of the Articles of War (the predecessor of Article 36 of the UCMJ) did not provide to enemy combatants in military tribunals the procedural protections (in that case, restrictions on the use of depositions) available in courts-martial under the Articles of War. *Yamashita*, 327 U.S. at 18–20, 66 S.Ct. 340. The Court's holding depended upon the fact that General Yamashita, an enemy combatant, was not subject to trial by courts-martial under then Article 2 of the Articles of War (the predecessor to Article 2 of the UCMJ), which conferred courts-martial jurisdiction only over U.S. military personnel and those affiliated with them. *Id.* at 19–20, 66 S.Ct. 340. The Court held that Congress intended to grant court-martial protections within tribunals only to those persons who could be tried under the laws of war in either courts-martial or tribunals. *See id.* The UCMJ and the 1949 Geneva Conventions had not come into effect in 1946. Article 2 of the UCMJ is now broader than Article 2 of the Articles of War. *See generally* Library of Congress, Index and Legislative History of the UCMJ (1950), http://www.loc.gov/rr/frd/Military_Law/index_legHistory.html. It has been expanded to include as persons subject to court-martial, both prisoners of war, 10 U.S.C. § 802(a)(9), and "persons within an area leased by or otherwise reserved or ac-

---

**15.** In *Kangaroo Court or Competent Tribunal?, supra* note 14 at 2020–22, the author suggests that one possible reading of this provision would require consistency only with those nine UCMJ articles (of 158 total) that express-ly refer to or recite their applicability to military commissions. A review of the articles that contain such references or recitals, however, *see id.* at 2014 n. 23, demonstrates the implausibility of such a reading.

quired for the use of the United States which is under the control of the Secretary concerned and which is outside the United States and outside the Commonwealth of Puerto Rico, Guam, and the Virgin Islands." *Id.* § 802(a)(12). One or both of those new categories undoubtedly applies to petitioner. For this reason, *Yamashita's* holding now arguably gives more support to petitioner's case than to the government's.[16]

*Madsen* follows *Yamashita* in its general characterization of military commissions as "our commonlaw war courts" and states that "[n]either their procedure nor their jurisdiction has been prescribed by statute." *Madsen,* 343 U.S. at 346–47, 72 S.Ct. 699. It does not appear that any procedural issue was actually raised in *Madsen,* however, nor were the Geneva Conventions addressed in any way in that case. Madsen was an American citizen, the dependent wife of an Armed Forces member, charged with murdering her husband in the American Zone of Occupied Germany in 1947 and tried there by the United States Court of the Allied High Commission for Germany. Her argument, which the Court rejected, was simply that the jurisdiction of military commissions over civilian offenders and non-military offenses was automatically ended by amendments to the Articles of War enacted in 1916 that extended the jurisdiction of courts-martial to persons accompanying United States forces outside the territorial jurisdiction of the United States. *Id.* at 351–52, 72 S.Ct. 699.

Even though *Madsen* presented no procedural issue, the Supreme Court did generally review the procedures applicable to Madsen's trial. A comparison between those procedures and the rules of the Guantanamo Military Commission is not favorable to the government's position here. In *Madsen,* United States Military Government Ordinance No. 2 (the analogue of the Military Commission Order in this case) provided, under "rights of accused":

> Every person accused before a military government court shall be entitled ... to be present at his trial, to give evidence and to examine or cross-examine any witness; but the court may proceed in the absence of the accused if the accused has applied for and been granted permission to be absent, or if the accused is believed to be a fugitive from justice.

*Id.* at 358 n. 24, 72 S.Ct. 699. There was no provision for the exclusion of the accused if classified information was to be introduced.

The government's best argument, drawing on language found in both *Yamashita* and *Madsen,* is that a "commonlaw war court" has been "adapted in each instance to the need that called it forth," 343 U.S. at 347–48, 72 S.Ct. 699 (citing *Yamashita,* 327 U.S. at 18–23, 66 S.Ct. 340). Neither the President in his findings and determinations nor the government in its briefs has explained what "need" calls forth the abandonment of the right Hamdan would have under the UCMJ to be present at every stage of his trial and to confront and

16. *Yamashita* has been undercut by history in another important respect. The Supreme Court found the guarantee of trial by court-martial for prisoners of war in the 1929 Geneva Convention inapplicable to General Yamashita because it construed that provision as applicable only to prosecutions for acts committed while in the status of prisoner of war. The Third Geneva Convention, adopted after and in light of *Yamashita,* made it clear that the court-martial trial provision applies as well to offenses committed by combatants while combatants. Third Geneva Convention, art. 85. *See also,* Glazier, *supra* note 12 at 2079–80.

cross-examine all witnesses and challenge all evidence brought against him. Presumably the problems of dealing with classified or "protected" information underlie the President's blanket finding that using the regular rules is "not practicable." The military has not found it impracticable to deal with classified material in courts-martial, however. An extensive and elaborate process for dealing with classified material has evolved in the Military Rules of Evidence. Mil. R. Evid. 505; *see* 10/25/04 Tr. 131–32. Alternatives to full disclosure are provided, Mil. R. Evid. 505(i)(4)(D). Ultimately, to be sure, the government has a choice to make, if the presiding military judge determines that alternatives may not be used and the government objects to disclosure of information. At that point, the conflict between the government's need to protect classified information and the defendant's right to be present becomes irreconcilable, and the only available options are to strike or preclude the testimony of a witness, or declare a mistrial, or find against the government on any issue as to which the evidence is relevant and material to the defense, or dismiss the charges (with or without prejudice), Mil. R. Evid. 505(i)(4)(E). The point is that the rules of the Military Commission resolve that conflict, not in favor of the defendant, but in favor of the government.

Unlike the other procedural problems with the Commission's rules that are discussed elsewhere in this opinion, this one is neither remote nor speculative: Counsel made the unrefuted assertion at oral argument that Hamdan has already been excluded from the *voir dire* process and that "the government's already indicated that for two days of his trial, he won't be there. And they'll put on the evidence at that point." 10/25/04 Tr. 132. Counsel's appropriate concern is not only for the established right of his client to be present at his trial, but also for the adequacy of the defense he can provide to his client. The relationship between the right to be present and the adequacy of defense is recognized by military courts, which have interpreted Article 39 of the UCMJ in the light of Confrontation Clause jurisprudence. The leading Supreme Court case is *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (one-way television viewing of witness in child abuse case permissible under rule of necessity), which noted that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact" and that the "elements of confrontation"—"physical presence, oath, cross-examination, and observation of demeanor by the trier of fact," serve among other things to enhance the accuracy of fact-finding by "reducing the risk that a witness will wrongfully implicate an innocent person." *Id.* at 846, 110 S.Ct. 3157 (internal citations omitted).

Following *Craig* in a military case involving child abuse, the Court of Appeals for the Armed Forces found that a military judge had misapplied the Supreme Court's holding when he excluded the defendant from the courtroom during a general court-martial:

There [in *Craig*], the witness was outside the courtroom and the defendant was present. Here, the witness was in the courtroom and appellant was excluded. While appellant could observe J's testimony, he could not observe the reactions of the court members or the military judge, and they could not observe his demeanor. He could not communicate with his counsel except through the bailiff, who was not a member of the defense team. We hold that this procedure violated the Sixth Amendment, Article 39, and RCM 804. While *Craig* and [*United States v. Williams*, 37 M.J. 289 (C.M.A.1993)] permit restricting an accused's face-to-

face confrontation of a witness, they do not authorize expelling an accused from the courtroom.

*United States. v. Daulton*, 45 M.J. 212, 219 (C.A.A.F.1996); *see also United States v. Longstreath*, 45 M.J. 366 (C.A.A.F.1996) (defendant separated from witness by television but present in courtroom).[17]

A tribunal set up to try, possibly convict, and punish a person accused of crime that is configured in advance to permit the introduction of evidence and the testimony of witnesses out of the presence of the accused is indeed substantively different from a regularly convened court-martial. If such a tribunal is not a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," it is violative of Common Article 3. That is a question on which I have determined to abstain. In the meantime, however, I cannot stretch the meaning of the Military Commission's rule enough to find it consistent with the UCMJ's right to be present. 10 U.S.C. § 839. A provision that permits the exclusion of the accused from his trial for reasons other than his disruptive behavior or his voluntary absence is indeed directly contrary to the UCMJ's right to be present. I must accordingly find on the basis of the statute that, so long as it operates under such a rule, the Military Commission cannot try Hamdan.

### 4. Hamdan's detention claim appears to be moot, and his speedy trial and equal protection claims need not be ruled upon at this time.

■ Until a few days before the oral argument on Hamdan's petition, his most urgent and striking claim was that he had been unlawfully and inhumanely held in isolation since December 2003 and that such treatment was affecting his mental and psychological health as well as his ability to assist in the preparation of his defense. Late on the Friday afternoon before the oral argument held on Monday, October 25, 2004, the government filed its "notice of a change in circumstances," advising the court that Hamdan had been moved back to Camp Delta—a separate wing of Camp Delta, to be sure, but nevertheless an open-air part of Camp Delta where pre-commission detainees can communicate with each other, exercise, and practice their religion. 10/25/04 Tr. at 11–12. That change in status may not exactly moot Hamdan's claim about his confinement in isolation, which the government is capable of repeating and which has evaded review. The treatment Hamdan may or may not be afforded in the future, however, is not susceptible to review on a writ of habeas corpus.

■ The second most urgent and most important claim in Hamdan's original petition was his claim of entitlement to the protection of the Uniform Code of Military Justice's speedy trial rule and his assertion that he had been detained more than the maximum 90 days permitted by Article 103 of the Third Geneva Convention. These concerns were more urgent before Hamdan was transferred out of Camp Echo and back to Camp Delta and before the Supreme Court made it clear, in *Hamdi*, that, whether or not Hamdan has been charged with a crime, he may be detained

17. The statute Congress enacted after and in light of the *Craig* opinion, 18 U.S.C. § 3509, carefully protects the rights of child victims and witnesses in abuse cases but preserves the right of the accused to be present. Even if a child witness is permitted to testify by videotaped deposition, the accused must be "present" via two-way television, and the defendant must be "provided with a means of private, contemporaneous communication with the defendant's attorney during the deposition." 18 U.S.C. § 3509(b)(2)(B)(iv).

for the duration of the hostilities in Afghanistan if he has been appropriately determined to be an enemy combatant.[18] The UCMJ's speedy trial requirements establish no specific number of days that will require dismissal of a suit. Article 103 of the Third Geneva Convention does bar pretrial detention exceeding 90 days, but it provides no mechanism or guidance for dealing with violations. The record does not permit a careful analysis of speedy trial issues under the test for the correlative Sixth Amendment right by *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). It is well established in any event that the critical element of prejudice is best evaluated post-trial. *U.S. v. MacDonald,* 435 U.S. 850, 858–59, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978).

It is also unnecessary for me to decide whether, by virtue of his detention at Guantanamo Bay, Hamdan has any rights at all under the United States Constitution or under 42 U.S.C. § 1981.[19]

## CONCLUSION

It is now clear, by virtue of the Supreme Court's decision in *Hamdi,* that the detentions of enemy combatants at Guantanamo Bay are not unlawful per se. The granting (in part) of Hamdan's petition for habeas corpus accordingly brings only limited relief. The order that accompanies this opinion provides: (1) that, unless and until a competent tribunal determines that Hamdan is not entitled to POW status, he may be tried for the offenses with which he is charged only by court-martial under the Uniform Code of Military Justice; (2) that, unless and until the Military Commission's rule permitting Hamdan's exclusion

from commission sessions and the withholding of evidence from him is amended so that it is consistent with and not contrary to UCMJ Article 39, Hamdan's trial before the Military Commission would be unlawful; and (3) that Hamdan must be released from the pre-Commission detention wing of Camp Delta and returned to the general population of detainees, unless some reason other than the pending charges against him requires different treatment. Hamdan's remaining claims are in abeyance.

## *ORDER*

For the reasons set forth in the accompanying memorandum opinion it is

**ORDERED** that the petition of Salim Ahmed Hamdan for habeas corpus [1–1] is **granted in part.** It is

**FURTHER ORDERED** that the cross-motion to dismiss of Donald H. Rumsfeld [1–84] is **denied.** It is

**FURTHER ORDERED** that, unless and until a competent tribunal determines that petitioner is not entitled to the protections afforded prisoners-of-war under Article 4 of the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949, he may not be tried by Military Commission for the offenses with which he is charged. It is

**FURTHER ORDERED** that, unless and until the rules for Military Commissions (Department of Defense Military Commission Order No. 1) are amended so that they are consistent with and not contrary to Uniform Code of Military Justice Article 39, 10 U.S.C. § 839, petitioner may

---

**18.** Hamdan does not currently challenge his detention as an enemy combatant in proceedings before this Court.

**19.** The Supreme Court's recent decision in *Rasul* does little to clarify the Constitutional

status of Guantanamo Bay but may contain some hint that non-citizens held at Guantanamo Bay have some Constitutional protection. *See Rasul,* —— U.S. at —— n. 15, 124 S.Ct. at 2698 n. 15.

not be tried by Military Commission for the offenses with which he is charged. It is

**FURTHER ORDERED** that petitioner be released from the pre-Commission detention wing of Camp Delta and returned to the general population of Guantanamo detainees, unless some reason other than the pending charges against him requires different treatment. And it is

**FURTHER ORDERED** that petitioner's remaining claims are **in abeyance**, the Court having abstained from deciding them.